GRACE CHALMERS LOWE *v.* GREEN MOUNTAIN POWER CORPORATION AND MONTPELIER & WELLS RIVER RAILROAD COMPANY.

January Term, 1940.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed February 6, 1940.

*Hugh W. Hastings* and *Conant & Parker* for the plaintiff.

*Homer L. Skeels* for the defendant.

MOULTON, C. J. ■ The plaintiff claims to be the owner of certain water rights at Lund's Pond (or, as it is sometimes called, Ricker's Pond), which she alleges are being wrongfully occupied and used by the defendant Green Mountain Power Corporation, and she seeks an injunction and an award of damages. After trial below the chancellor made a finding of facts and entered a decree dismissing the bill. The plaintiff has appealed and has filed exceptions to certain of the findings, but since none of these exceptions are briefed we do not consider them. The only question before us, upon the appeal, is whether the decree is supported by the facts found.

Upon hearing before us the Montpelier and Wells River Railroad Company, the track of which extends across the premises claimed by the plaintiff, asked leave to enter as a party defendant. The plaintiff consented and leave was granted, but no answer or other pleading has been filed by the railroad company.

From the findings of fact it appears that the plaintiff is the owner of certain land situated on the southerly side of Lund's Pond which comprises parts of lot 70 in the 3rd division and lot 76 in the 1st division in the town of Groton, conveyed by

two deeds to the late Alexander Dunnett, from whom she traces her title. There is no claim that the water rights in dispute are included in the deed of the portion of lot 76 and the issue is whether they have passed to her by the deed of the premises in lot 70.

Mr. Dunnett acquired title to this land by quitclaim deed from Benjamin Ricker, dated May 19, 1894, which referred to a like deed to Benjamin Ricker from Isaac N. Hall and Jonathan R. Darling, dated February 28, 1887, in which the premises are described as "Being the Lake House and outbuildings and two or more acres of land connected therewith, situated in Lot No. Seventy in the 3rd Division of Land in said Groton, being the premises where Leverett H. Page now resides, and is all the interest we have in said lot of land and buildings." A part of the building extended over the boundary of lot 70, and was on lot 76, and the chancellor has found that the land so covered passed by the deed. On June 12, 1902, Alexander Dunnett conveyed to Lafayette Carpenter by warranty deed the same premises described as "being the property known as the Lake House Property consisting of about three acres of land and the buildings thereon, and it is the same property lately occupied by me as a summer residence." After the death of Lafayette Carpenter, his administrator, on January 17, 1910, reconveyed the premises to Dunnett. At some time prior to the conveyance to Carpenter, all right, title and interest which the estate of Leverett Page and his widow Sarah Page had in the Lake House property was foreclosed by Alexander Dunnett. In what this right, title and interest consisted does not appear. Before the conveyance to Benjamin Ricker, in 1887, Hall and Darling had, on October 9, 1872, quitclaimed to the Montpelier and Wells River Railroad Company a right of way "through lot No. Seventy, third division in said Groton, five rods wide, two and one-half rods from the center line of said railroad." This right of way occupies the northerly portion of the land upon which the Lake House is situated and is contiguous to the waters of Lund's Pond.

Lot 76 adjoins lot 70 on the east. It was originally set out as a school lot, and, on September 16, 1807, was leased by the trustees of the Caledonia County Grammar School to Silas Lund, "as long as grass grows and water runs" at an annual rental

of seventeen dollars. At some time before 1817 Lund constructed thereon a sawmill and a grist mill operated by water power from the pond.  Through a series of conveyances the title came to Joseph Ricker on April 14, 1856, and remained in the Ricker family until October 9, 1922, when a part of lot 76, including the water rights in the pond and the water wheel, gate mechanism and machinery, was conveyed to the Eastern Vermont Public Utilities Corporation.  The defendant Green Mountain Power Corporation acquired its title by deed from the receiver of the Eastern Vermont Public Utilities Corporation on November 17, 1927.

The disputed water rights are three fifths of the dam and bulkhead at the southern outlet of the pond and a part of the pond itself bordering upon the southern shore.  The plaintiff founds her claim of title upon the following records appearing in the findings.  A warranty deed from Samuel Hooper to Sarah Hooper, dated July 19, 1859, covering land in lot 70, containing this exception: "Except * * * that McLane Marshall has by verbal lease the right to occupy and enjoy the premises he now occupies as and for a public house so long as he continues to occupy same in person for the purpose aforesaid * * *." This public house and premises are found to be the Lake House property.  On June 5, 1865, Marshall and his wife executed to Sylvester Charter a warranty deed of premises described as "Being about three acres of land more or less in Lot No. Seventy, with the Lake House on the same, in the third division in said town; Commencing at the Southwest corner of Lot No. 70 at a stake and stones; thence east on the South Line of said lot to the bulkhead of the outlet of Wells River Pond, thence north to the edge of said Wells River Pond, thence due west to the West Line of said lot, thence south on the West Line of said lot to the first mentioned bounds." It is very evident that the draftsman of this instrument was confused as to the points of the compass, since the course from the southwest corner east on the south line of the lot does not come anywhere near the bulkhead, but extends in a totally different direction.  The true description of the premises which Marshall probably intended to convey appears in the levies of two executions on judgments obtained against him in favor of Isaac N. Hall and J. R. Darling in 1866 and 1867, thus: "on lot number Seventy (70) in the

third division in said town commencing at the south east corner
of said lot at a stake and stones, thence north on the East Line
of said lot to the bulkhead of the Outlet of Wells River Pond
so called, thense west parallel with the South Line of said lot
fur enough to contain three acres of land, thence south parallel
with the East Line of said lot to the South Line of said lot,
thence east in said South Line to the southwest corner of said
lot.'' The premises thus described were sold on the execution,
but to whom does not appear.

It is found that the evidence does not disclose any conveyance
from Sylvester Charter subsequent to the execution of the deed
to him from McLane Marshall and wife on June 5, 1865.

The findings state that the premises occupied by Marshall
under the verbal lease referred to in the Hooper deed were
situated on lot 70, except that a small addition on the easterly
end of the Lake House had been constructed on lot 76; and it
is also found that the bulkhead and dam in issue have always
been on lot 76, and never on lot 70.

The latter finding is attacked by the plaintiff as being
inconsistent with the previous findings, which she claims estab-
lish her title to the property described by metes and bounds and
monuments in the Marshall deed and the levies of execution.
But this claim is unfounded. Marshall had no title beyond a
leasehold interest which existed only so long as he personally
conducted a public house upon the premises. As we have seen,
his occupation was confined to lot 70, with the small exception
noted. The execution sale could pass only such title and interest
as the judgment debtor had. *Sanborn* v. *Kittredge,* 20 Vt. 632,
640, 50 Am. Dec. 58. The purchaser is unidentified. So far
as appears neither Hall and Darling nor Benjamin Ricker owned
any part of lot 76 except just so much of it as was covered by
a portion of the building. There is no mention of the deed of
Marshall to Charter or of the records of the levies of execution
and sale in any of the subsequent conveyances of the Lake House
property by which it could be said that a more particular de-
scription was incorporated by reference. The description of the
property conveyed in 1894 by Benjamin Ricker to Alexander
Dunnett—''the Lake House and outbuildings and two or more
acres of land connected therewith, situated on Lot No. Seventy

in the 3rd Division of Land in said Groton''—is not, in itself, sufficient to include the water privilege. See *Miller* v. *Mann*, 55 Vt. 475, 478, 479. The location of the boundary line between lots 70 and 76, which the chancellor has found, is a question of fact, (*Vermont Marble Co.* v. *Eastman*, 91 Vt. 425, 447, 101 Atl. 151) and no exception to the finding on the ground that it is not supported by the evidence is briefed.

Thus it appears that the facts as found do not support the plaintiff's claim of a record title, upon which, of course, she had the burden of proof, and the asserted inconsistency does not exist.

But the plaintiff argues that the boundary line has been established by acquiescence. This contention is founded upon findings that she and her predecessors in title have used that portion of the pond which is contiguous to the Lake House property for boating and fishing and the washing of blankets and clothes and have placed boards on the top of the dam to facilitate walking thereon to the island which lies at the other end, and that she has transmitted messages from the defendant and its predecessor to one of its employees to open and close the gate in the back dam whenever the defendant desired a flow of water. It is also found, however, that the Rickers and their predecessors ''for a long time maintained and operated a saw mill at the pond and used the bulkhead dam for the purpose of controlling the flow of water into the mill pond and for the regulation of logs floated through the dam into the mill pond, and used the water power for sawing logs and grinding grist.'' It is sufficient to say that these facts raise no compelling inference of acquiescence. In support of the decree we will assume that the chancellor inferred that there was none, as he might fairly have done. *Labor* v. *Carpenter*, 102 Vt. 418, 422, 148 Atl. 867.

The decree is supported by the facts as found. All the questions briefed have been considered and no error appears. It is unnecessary to consider whether the interest of the Montpelier and West River Railroad Company is an estate in fee or an easement. This point, although suggested, has not been briefed

or argued, and it is not perceived wherein it is material to the disposition of the cause.

*Decree affirmed with costs to the defendant Green Mountain Power Corporation. No costs are awarded to the defendant Montpelier and Wells River Railroad Company.*